**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Edwin Thomas BARRETT, Defendant-Appellant.**

No. 81–1622.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 1982.

Decided April 11, 1983.

As Amended on Denial of Rehearing June 7, 1983.

Stephen R. Sady, Portland, Or., for defendant-appellant.

William W. Youngman, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.

Before CHOY, TANG and BOOCHEVER, Circuit Judges.

CHOY, Circuit Judge:

Edwin Barrett appeals from his conviction, after trial by jury, for robbing a federally insured savings and loan association, in violation of 18 U.S.C. § 2113(a). He contends that the trial court erred in (1) denying his motion for a continuance that was needed to enable his counsel to prepare for cross-examination and rebuttal of the Government's photographic expert; (2) refusing to substitute an alternate juror for, or allow defense counsel to question, a juror who claimed to have been sleeping during the trial; and (3) admitting certain testimony of Government witnesses that should have been excluded. Because we find error in the trial court's handling of the "sleeping"-juror question, we remand for a hearing on this issue.

### I. Facts

On June 5, 1981, at about 3:25 p.m., a lone robber entered the Uptown Branch of Western Savings and Loan in Portland, Oregon. The robber approached Lydia Bass, a teller, showed her a gun, and demanded money. Bass gave the robber approximately $410 and two clips of bait bills—one containing a dye pack and the other activating the bank surveillance cameras.

On June 9, 1981, a Federal Bureau of Investigation agent and a Portland police officer went to Barrett's residence and confronted Barrett with a surveillance photograph taken during the June 5th robbery. Barrett accompanied the officers to the Portland office of the FBI where he was questioned by Special Agent Stanley Renning, released, then arrested two and a half hours later.

At trial, the major issue was one of identification. The Government introduced four 8- by 10-inch surveillance photographs of the robber and two smaller photographs of Barrett as he appeared before he shaved his beard and mustache. All the witnesses who testified at trial were for the Government. Bass, the teller, testified that she had previously selected Barrett's photograph as that of the robber in a pretrial photographic spread, although she had not been certain of the identification. She also identified a gun and clothing seized from Barrett as resembling those used by the robber, and made a positive in-court identification of Barrett.

Barbara Lemon, Barrett's live-in girl friend, testified that the person in the surveillance photograph was Barrett. She also

testified that the clothes seized [1] by the FBI were worn by Barrett on June 5th, the day of the robbery; that the gun seized [2] by the FBI was a starting pistol that belonged to her; that Barrett left home at 7:00 a.m. on the day of the robbery, claiming that he was going to work for Hoffman Construction Company,[3] and did not return until 4:00 p.m.; that when he returned at 4:00 p.m., Barrett gave her $230 in cash to pay a telephone bill; that later that same day he shaved off his beard and mustache; and that he took her to dinner that night and paid the bill, something he usually did not have money to do.

Special Agent Stanley Renning of the FBI testified regarding statements Barrett had made while being questioned on June 9th about the robbery. Agent Renning testified that Barrett said that he spent the major portion of the afternoon at home preparing for a fishing trip on the day of the robbery, and that he shaved off his beard and mustache on June 4th, the day before the robbery.

Finally, Peter Smerick, an FBI photographic expert, testified that he compared the clothing of Barrett seized by the FBI with that worn by the robber in the bank surveillance photograph by use of a microscope and high-intensity light.[4] Smerick testified to detailed similarities between Barrett's clothing seized by the FBI and that worn by the robber in the surveillance photograph, including the color and placement of buttons on the sweater, the stripes and placement of buttons on the shirt, and the stains found on the cap.

## II. Discussion

### A. Denial of Barrett's Motions for Continuance

Barrett contends that in view of the Government's last-minute production of a photographic expert witness, the trial court should have granted a continuance to enable his counsel to prepare for cross-examination and rebuttal of that expert. The Government first notified Barrett of its intention to call a photographic expert as a witness on July 28, 1981, eight days before trial. Barrett had earlier moved for a continuance because of his counsel's involvement in other trials. On July 31, 1981, Barrett supplemented this motion by submitting an affidavit by his counsel stating that a continuance was necessary in order for Barrett to prepare for the expert and possibly obtain a defense expert.

On August 3, 1981, two days before trial, the Government provided Barrett with the results of the expert's report. Although the record indicates that Barrett made a diligent effort to secure an expert to assist him before trial, he was unsuccessful. Barrett made numerous motions for continuance before and during trial which were all denied.

Barrett relies principally on the Second Circuit decision of *United States v. Kelly*, 420 F.2d 26 (2d Cir.1969), to support his argument that the trial court's failure to grant a continuance constitutes reversible error. The defendants in *Kelly* were two police officers who were charged with retaining and selling cocaine that they had seized in an earlier raid. At trial, the Government introduced the results of neutron-activation tests which tended to show that the cocaine sold by the defendant police officers came from the same batch seized in the earlier raid. The Government, in violation of a discovery order, had not informed the defendants of the tests, and the defendants first learned of the test results when they were introduced at trial.

---

1. Lemon, who was living with Barrett at the time of the robbery, turned over both the clothes and gun to the FBI after being approached by them.

2. See *supra* note 1.

3. Candice Philbrick, payroll clerk for Hoffman Construction Company, later testified that Barrett was not employed by the company on the date of the robbery.

4. Smerick's examination actually involved a three-way comparison between Barrett's clothes, the surveillance photograph, and photographs taken of an FBI agent modeling Barrett's clothes in a posture similar to that held by the robber in the surveillance photograph.

The defendants' motion for a continuance to carry out its own version of the tests was denied and the defendants were subsequently convicted.

■ In reversing the defendants' convictions, the Second Circuit held that "fairness requires that adequate notice be given the defense to check the findings and conclusions of the government's experts." *Id.* at 29.' The court ordered a new trial to give the defendants a fair opportunity to run their own neutron-activation tests. *Id.*

We conclude that the rule announced in *Kelly* applies to the present case. Thus, the question becomes whether Barrett was given adequate time to obtain an expert to assist him in attacking the findings of the Government's photographic expert. Under the circumstances of this case, we find that Barrett was not given adequate time to obtain an expert to assist him in attacking the Government's expert.

Barrett was first notified of the Government's intent to call a photographic expert eight days before trial. He received the results of the expert's tests only two days before trial. The record indicates that Barrett probably could have obtained an expert to assist him had he been given more time.

The denial of a continuance is within the trial court's discretion and should not be disturbed on appeal absent clear abuse. *United States v. Hoyos,* 573 F.2d 1111, 1114 (9th Cir.1978). In failing to grant the requested continuance to allow Barrett adequate time to obtain the assistance of an expert, the trial court clearly abused its discretion. *Cf. United States v. Durant,* 545 F.2d 823, 827–28 (2d Cir.1976) (failure to grant indigent defendant's request for fingerprint expert violates Criminal Justice Act); *Barnard v. Henderson,* 514 F.2d 744, 746 (5th Cir.1975) (defendant has right to have own ballistics expert examine evidence).

■ Our finding of error does not end our inquiry. We must also determine whether the error amounts to one requiring reversal of Barrett's conviction. In this context, it is important to note that our finding of error is based on our determination that Barrett should have been given additional time to secure a defense expert for the limited purpose of assisting him in attacking the credibility of the Government's expert through cross-examination and rebuttal. It is not based on a determination that Barrett was entitled to additional time to secure a defense expert witness to provide affirmative proof of his innocence by showing that his seized clothes and the clothes worn by the robber in the surveillance photograph were different. Barrett received general discovery in the case three weeks before trial; it was only notification of the Government's intention to call a photographic expert and the results of the expert's tests that were received late. If Barrett had desired a photographic expert to provide affirmative proof of his innocence, he had ample time to secure one. The prejudice resulting to Barrett from the denial of the continuance is thus limited to his difficulty in attacking the credibility of the Government's witness without the aid of an expert.[5]

■ This prejudice could have been eliminated by excluding the testimony of the Government's expert witness. Therefore, the denial of the continuance would be harmless error if the improper admission of the testimony of the Government's expert under the facts of this case would be deemed harmless.

■ An error is considered harmless and shall be disregarded on review if it does not affect substantial rights of the defendant. Fed.R.Crim.P. 52(a).[6] This circuit has for-

---

**5.** It is significant to note that Barrett's requests for a continuance did not allege a need to secure a photographic expert to establish his innocence. His requests were based on the need to secure an expert to assist him in preparing for cross-examination and rebuttal of the Government's expert. Barrett first ex- pressed his desire for a photographic expert only after the Government had notified him of its intent to call one.

**6.** Although the court's error in denying the continuance impeded defense counsel's ability to

formulated a test requiring the determination of whether the prejudice resulting from the error was more probably than not harmless. *United States v. Castillo,* 615 F.2d 878, 883 (9th Cir.1980).

■ The Government introduced the testimony of the photographic expert for the purpose of identifying Barrett as the robber. We find that the other Government evidence introduced at trial identifying Barrett as the robber is so overwhelming that the improper admission of the expert's testimony would be deemed harmless error. *United States v. Burke,* 506 F.2d 1165, 1170 (9th Cir.1974) (erroneous admission of photographic expert's testimony harmless in view of other overwhelming evidence), *cert. denied,* 421 U.S. 915, 95 S.Ct. 1576, 43 L.Ed.2d 781 (1975); *United States v. Brown,* 501 F.2d 146, 150 (9th Cir.1974) (same), *rev'd in part on other grounds sub nom. United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *United States v. Trejo,* 501 F.2d 138, 143 (9th Cir. 1974) (same).[7] The Government's considerable identification evidence included (1) four clear[8] 8- by 10-inch bank surveillance photographs of the robber for the jury to examine and compare with two smaller photographs of Barrett taken before he had shaved his beard and mustache, Barrett's clothes seized by the FBI, and Barrett's physical appearance at trial; (2) a positive in-court identification by Bass, the teller, who had previously given a fairly accurate description[9] of the robber to the police and who also identified the clothing seized from Barrett as resembling that worn by the robber; and (3) the testimony of Lemon,

Barrett's live-in girl friend, who identified Barrett as the person in the surveillance photo. Since the improper admission of the Government expert's testimony would be deemed harmless, it follows that the district court's failure to grant the continuance is harmless error. We hold that no substantial rights of Barrett were affected by the error.

### B. *Sleeping Juror*

After the court had instructed the jury but before the jury began its deliberations, a juror apparently[10] asked to be removed from the panel because he had been sleeping during the trial. The judge advised both counsel of the juror's request, stating:

> Counsel, Mr. Detweiler, Juror No. 4, has been sleeping during this trial. And he's indicated to the clerk that he would prefer to be excused in favor of the alternate juror, Mr. West.

The judge went on to state:

> I don't have the authority to do that [order the substitution]. If you wish to do it by stipulation, I shall, or will leave it alone, depending on the view of counsel.

Barrett requested the substitution, but the Government refused to so stipulate. In the absence of the Government's stipulation, the judge refused to order the substitution.

After the jury returned a verdict of guilty, Barrett filed a motion to permit the defense to interview the juror. The trial judge denied the motion, stating:

> On the matter of the juror, there was no juror asleep during this trial. I watch the jurors constantly. Of course, I can't tell whether somebody might have felt

prepare for trial, it cannot be said that the error implicated the constitutional right to cross-examination. Sixth amendment rights may be violated by less than a complete denial of cross-examination, but this case does not involve a sufficient diminution of the right to come within the constitutional protection. The scope of cross-examination was not directly curtailed; defense counsel had a full opportunity to question the government's expert witness. Counsel received the government's report before trial. *See United States v. Jordan,* 466 F.2d 99 (4th Cir. 1972), *cert. denied,* 409 U.S. 1129, 93 S.Ct. 947, 35 L.Ed.2d 262 (1973), *United States v. Hernandez,* 608 F.2d 741 (9th Cir. 1979). Because no constitutional rights were violated in this case, we apply the nonconstitutional harmless error standard of review.

7. It is important to note that the Government did not emphasize the photographic expert's testimony during closing argument and instead

invited the jurors, with their own eyes, to compare the surveillance photographs with the clothes that were seized from Barrett by the FBI.

8. We have examined the actual surveillance photographs and found them surprisingly well-focused and clear in detail. The general features of the robber's face and body as well as the details of his clothes, such as the placement of buttons on his sweater and shirt, are discernible.

9. After the robbery, Bass described the robber to the police as a white male, 55–60, about six feet tall, stout with a baker's belly, wearing a red baseball cap, a green sweater, jeans, and a red shirt. Only the description of the shirt, which was plaid, was mistaken.

10. The record does not show exactly what was said by the juror.

drowsy, nor could I tell if somebody has a personal problem of some kind which might divert their mind from the case.

■ Other circuits have allowed a trial judge, in response to a defendant's allegation that a juror had been sleeping, to take judicial notice of the fact that the juror had not been sleeping without requiring the judge to make any inquiry into the allegation. *United States v. Curry,* 471 F.2d 419, 421–22 (5th Cir.), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973); *United States v. Carter,* 433 F.2d 874, 876 (10th Cir.1970). We do not believe, however, that under the particular circumstances of this case, the trial judge could properly take judicial notice of the fact that "there was no juror asleep during this trial" without making further inquiry into the matter. Unlike the above cited cases where the allegation of a sleeping juror was raised by the defendant, the court in this case was apparently informed by the juror himself that he had been sleeping during the trial. In view of the juror's own statement, we have no basis for accepting the trial judge's bare assertion that no juror had been asleep during trial.[11]

■ The trial judge has considerable discretion in determining whether to hold an investigative hearing on allegations of jury misconduct and in defining its nature and extent. *United States v. Hendrix,* 549 F.2d 1225, 1227 (9th Cir.), *cert. denied,* 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977). We nevertheless hold that in failing to conduct a hearing or make any investigation into the "sleeping"-juror question, the trial judge abused his considerable discretion in this area.[12] The case is remanded with instructions that the trial judge conduct a hearing to determine whether the juror in fact was sleeping during trial and, if so, whether the juror's being asleep prejudiced Barrett to the extent that he did not receive a fair trial. *United States v. Hendrix,* 549 F.2d at 1229.[13] The trial judge shall conduct the hearing and shall submit his findings and conclusions along with a copy of the hearing transcript to this court. We retain jurisdiction pending receipt of the trial judge's findings and conclusions and a copy of the hearing transcript.

## C. *Admission of Testimony*

■ Finally, Barrett claims that the trial court erred in admitting the testimony of several Government witnesses. Specifically, he challenges the admission of (1) the in-court identification of the teller, Bass; (2) the testimony of his girl friend, Lemon, identifying him as the person in the bank surveillance photograph; and (3) certain

---

**11.** Although we do not question the good faith of the trial judge, we also place some significance on the fact that the trial judge did not assert his knowledge that no juror had been asleep when the question was first raised, but only asserted this knowledge after the jury had returned a verdict of guilty.

**12.** The record demonstrates that the trial judge believed that he had no authority to substitute an alternate for the alleged sleeping juror absent a stipulation by both parties. Because of this belief, the judge may have concluded that once the Government refused to stipulate to the substitution, any hearing or other investigation into the "sleeping"-juror question would have been meaningless. We note that if the trial judge's decision not to conduct a hearing or investigation was based on his belief that he had no independent authority to substitute an alternate juror for a sleeping juror, the decision was based on an erroneous premise. Under Rule 24(c) of the Federal Rules of Criminal Procedure, a trial judge has the independent

authority to order such a substitution. *United States v. Smith,* 550 F.2d 277, 285–86 (5th Cir.), *cert. denied,* 434 U.S. 841, 98 S.Ct. 138, 54 L.Ed.2d 105 (1977); *United States v. Cameron,* 464 F.2d 333, 334–35 (3d Cir.1972).

**13.** We have previously stated that even if the allegations of juror misconduct are found to be true, the inquiry does not end there because not every incident of juror misconduct requires a new trial. *United States v. Hendrix,* 549 F.2d 1225, 1229 (9th Cir.), *cert. denied,* 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977). The court must determine whether the resulting prejudice amounted to a deprivation of the fifth amendment due-process or sixth amendment impartial-jury guarantees. *Id.* Therefore, even if the juror in the present case is found to have been asleep during portions of the trial, a new trial may not be required if he did not miss essential portions of the trial and was able fairly to consider the case.

statements he made to FBI Special Agent Renning.[14]

### 1. *Bass' In-Court Identification*

Approximately two weeks after the robbery, the teller, Bass, was asked to identify the robber from among a pretrial photographic spread prepared by the FBI. The photographic spread consisted of nine photographs of white males of similar age and possessing similar facial characteristics. Bass selected Barrett's photograph as strongly resembling the robber, although she was not certain of the identification. The day before the trial, Bass was again shown the photographic spread along with the surveillance photographs and two smaller photographs of Barrett before he had shaved his beard and mustache. At trial, she made a positive in-court identification of Barrett.

■ Convictions based on in-court identification following a pretrial identification by photograph will be set aside where the photographic-identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). Barrett's principal contention is that the pretrial photographic spread was so impermissibly suggestive that it tainted Bass' subsequent in-court identification.[15] Specifically, Barrett asserts that (1) he was the only person in the photographic display wearing dark glasses (the robber had been described as wearing dark glasses); (2) his photograph was one of five in which height

---

**14.** Barrett also challenges the admission of the testimony of the Government's photographic expert, Smerick, regarding the detailed similarities between Barrett's seized clothing and that worn by the robber in the surveillance photograph. In discussing the denial of Barrett's motion for continuance, we have already stated that even assuming that Smerick's testimony was inadmissible, the admission of his testimony would be harmless error. We thus need not spend an extended period of time discussing the admissibility of Smerick's testimony. We find that if viewed independent of the denial of the continuance, the trial court's admission of Smerick's testimony was entirely proper.

Barrett argues that the trial court's admission of Smerick's testimony violated Fed.R. Evid. 702 which provides that an expert may not testify unless his or her specialized knowledge will "assist the trier of fact to understand the evidence or determine a fact in issue." Barrett asserts that Smerick's testimony added nothing to the jury's own ability to compare the seized clothing with the clothing in the surveillance photographs. He therefore contends that the trial court erred in finding that Smerick's testimony would assist the trier of fact within the meaning of Rule 702.

We disagree. The trial court's discretion to admit expert testimony under Rule 702 may not be disturbed on appeal absent clear abuse. *United States v. Brown,* 501 F.2d 146, 149 (9th Cir.1974), *rev'd in part on other grounds sub nom. United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). Smerick testified to similarities between the tonal condition, style and placement of buttons, stripes, and stains found on the seized clothing and the clothing in the surveillance photographs. We cannot say that the trial court abused its discretion in finding that the testimony was suffi-

ciently detailed to assist the trier of fact within the meaning of Rule 702. *See United States v. Collins,* 559 F.2d 561, 565 (9th Cir.), *cert. denied,* 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977).

Barrett additionally argues that the trial court erred in failing to grant a mistrial when Smerick exceeded the limits imposed by the pretrial order by testifying on the ultimate issue of the identity between the clothes seized from Barrett and the clothes in the surveillance photograph. This argument is also without merit. Expert testimony on an ultimate fact is permitted under Fed.R.Evid. 704. Although the Government had voluntarily agreed that Smerick would not testify on the ultimate issue of whether the seized clothes and clothes in the surveillance photograph were identical, the trial court, in the absence of this self-imposed limitation, would not have required it. Moreover, the trial court gave the jury a curative instruction immediately after Smerick's improper testimony was made. Under these circumstances, we find that the trial court correctly determined that Smerick's improper testimony on the ultimate issue did not warrant a mistrial.

**15.** Barrett also argues on appeal that Bass' in-court identification was tainted by the Government's reshowing her the photographic spread as well as showing her the surveillance photographs and two pictures of Barrett before he had shaved his beard and mustache. Since Barrett did not raise this argument before the trial court, we do not believe it proper for us to consider the argument on appeal. In any event, even had we considered the argument, it would not have affected our analysis of the admissibility of Bass' in-court identification.

lines typical of a booking facility appeared in the background; (3) all the men in the photographic spread were clean-shaven, implicitly indicating that the robber had shaved; and (4) he was the largest person in the photographic spread.

■ We have examined the photographic spread and agree with both the trial judge's observation that it was "an extraordinarily fair throwdown," [16] and his finding that the spread was not impermissibly suggestive. *See United States v. Collins,* 559 F.2d 561, 563 (9th Cir.), *cert. denied,* 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977). All the men in the photographic display are remarkably similar in appearance. The only noticeable difference is that Barrett is the only one wearing photosensitive glasses and thus his glasses have a darker tint than those worn by the others. But even this difference is barely noticeable and does not serve to single out Barrett from the others.

■ Moreover, even if there were some suggestiveness in the photographic-spread identification, we find that Bass' in-court identification was sufficiently reliable to justify its admission. The reliability of an in-court identification is the linchpin in determining its admissibility. *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *United States v. Field,* 625 F.2d 862, 866 (9th Cir.1980). The Supreme Court has identified five factors among the totality of the surrounding circumstances that we must consider in assessing the reliability of the identification testimony. They are:

1. [t]he opportunity of the witness to view the criminal at the time of the crime,

2. the witness' degree of attention,

3. the accuracy of the witness' prior description of the criminal,

4. the level of certainty demonstrated by the witness at the [pretrial] confrontation, and

5. the length of time between the crime and the [pretrial] confrontation.

*Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *United States v. Field,* 625 F.2d at 866. These five indicia of reliability must be balanced by the reviewing court against the corrupting effect of the suggestive pretrial identification procedure to determine whether the in-court identification should have been admitted. *Manson v. Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253; *United States v. Field,* 625 F.2d at 866.

■ Applying the five-factor analysis to the facts of the present case, we find that Bass had a good opportunity to view the robber at the time of the crime. She was the victim of the robbery and testified that she had taken a long look at the robber during the robbery. Being the target of the robbery, her degree of attention was undoubtedly high. Her actions in giving the robber two clips of bait bills, one containing a dye pack and the other activating the surveillance camera, demonstrates her alertness at the time of the robbery. Bass' prior description of the robber was detailed and fairly accurate. She correctly described the robber as a white male, about 55 to 60, about six feet tall, stout with a baker's belly, wearing a red baseball cap, green sweater, jeans, and horn-rimmed glasses. Only her description of the robber's shirt was incorrect. Although her level of certainty in identifying Barrett at the pretrial photographic spread was not high, she did select Barrett from among nine similar photographs. Finally, the length of time between the robbery and Bass' pretrial photographic-spread identification was only two weeks.

Weighing these five strong indicia of reliability against the minimal suggestiveness of the pretrial photographic spread, we are convinced that Bass' in-court identification was sufficiently reliable to justify its admission.

### 2. Lemon's Lay-Opinion Identification

As part of her testimony at trial, Lemon, Barrett's girl friend, identified Barrett as

---

**16.** The trial judge went on to say that the photographic spread was one of the best and fairest he had ever seen.

the person in the bank surveillance photograph. Barrett argues that the admission of this testimony violated Fed.R.Evid. 701(b) which limits lay-opinion testimony to that which is "helpful to . . . the determination of a fact in issue." Barrett contends that any need for Lemon's lay-opinion identification was totally obviated by the fact that the jury had before it two photographs of Barrett with a beard and mustache as well as Barrett himself to compare against the surveillance photographs. He therefore claims that Lemon's lay-opinion identification was not helpful to the determination of the identification issue.

We disagree. Barrett, like the robber in the surveillance photograph, had a full beard and mustache around the time of the robbery. Since that time, his appearance had substantially changed as he was clean-shaven during the trial. We find that in view of Lemon's intimate acquaintance with Barrett when he had a beard and mustache, and the subsequent change in his appearance, Lemon's lay-opinion identification of Barrett was helpful to the determination of the identification issue as required by Rule 701. *See United States v. Borrelli*, 621 F.2d 1092, 1095 (10th Cir.) (lay-opinion identification admissible under Rule 701 where defendant's appearance had significantly changed since time of robbery), *cert. denied*, 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 222 (1980).

We will not disturb the trial court's discretion to admit lay-opinion testimony under Rule 701 absent clear abuse. *United States v. Butcher*, 557 F.2d 666, 670 (9th Cir.1977). We find no abuse of discretion in the trial court's admission of Lemon's lay-opinion identification under Rule 701.

Barrett also argues that the admission of Lemon's testimony violated Fed.R. Evid. 403 because its probative value was substantially outweighed by the danger of unfair prejudice. We again apply the abuse-of-discretion standard of review, *United States v. Hobson*, 519 F.2d 765, 771 (9th Cir.), *cert. denied*, 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261 (1975), and find Barrett's unfair-prejudice claim to be without merit.

3. *Admission of Statements Made by Barrett*

At trial, FBI Special Agent Renning testified to statements Barrett had made while being questioned about the robbery. Renning testified that Barrett said that he spent the major portion of the afternoon of June 5th, the date of the robbery, preparing for a fishing trip and that he shaved off his beard and mustache on June 4th, the day before the robbery. Barrett contends that these statements should have been suppressed because they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[17]

We disagree. The trial court held a pretrial suppression hearing to determine the admissibility of the challenged statements. The trial court heard conflicting testimony from FBI agents Stewart and Renning on the one hand and Barrett on the other.[18] While acknowledging the difference in testimony, the court found that Barrett had his *Miranda* rights read to him in full. The court further found that Barrett was not in custody nor under arrest when he made the statements.

---

**17.** On appeal, Barrett also argues, for the first time, that the statements should have been suppressed because they were the product of an unlawful initial detention. Because this ground for suppression was not raised before the trial court, we decline to address it on appeal. *United States v. Hicks*, 524 F.2d 1001, 1004 (5th Cir.1975), *cert. denied*, 424 U.S. 946, 96 S.Ct. 1417, 47 L.Ed.2d 353 (1976); *United States v. Castanon*, 453 F.2d 932, 935 (9th Cir.), *cert. denied*, 406 U.S. 922, 92 S.Ct. 1788, 32 L.Ed.2d 122 (1972).

**18.** At the pretrial suppression hearing, FBI agent Robert Stewart testified that four days after the robbery, he and a Portland police officer confronted Barrett at his residence, showed him the surveillance photograph, and asked that he accompany them to the Portland FBI office. Stewart stated that he specifically informed Barrett that he was not under arrest. He further testified that while en route to the FBI office, he advised Barrett of his constitutional rights by reading a copy of the Portland Police Constitutional Rights Advice form, and by letting Barrett read the form himself. Stew-

Findings of fact made at a suppression hearing will not be disturbed on appeal unless clearly erroneous. *United States v. Botero,* 589 F.2d 430, 433 (9th Cir.1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979). In making its findings, the trial court credited the testimony of FBI agents Stewart and Renning over that of Barrett. This credited testimony provides support for the trial court's findings. We therefore hold that the factual finding of the trial court that Barrett was read his *Miranda* rights is not clearly erroneous and is entitled to our acceptance on appeal. *See United States v. Coletta,* 682 F.2d 820, 825 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1187, 75 L.Ed.2d 433 (1983); *United States v. Dufur,* 648 F.2d 512, 514 (9th Cir.1980), *cert. denied,* 450 U.S. 925, 101 S.Ct. 1378, 67 L.Ed.2d 355 (1981).

Applying the facts found by the district court, we conclude that Barrett's *Miranda* rights were not violated and that his statements were properly admitted. We do not reach the question of whether Barrett was not in custody at the time he made the statements, and thus was not entitled to any *Miranda* protection, *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). Even assuming he was in custody and entitled to *Miranda* protection, he was advised of his rights under *Miranda* and waived them.

III. *Conclusion*

We find that the trial court's denial of the continuance was error but, under the

circumstances of this case, the error was harmless. We also find that the trial court did not err in admitting the testimony of government witnesses challenged by Barrett on appeal. However, because we believe that the trial judge abused its discretion in failing adequately to investigate the "sleeping"-juror question, we remand the case for a hearing on this matter. We retain jurisdiction of this case pending receipt of the trial judge's findings and conclusions, along with a copy of the hearing transcript, on the "sleeping"-juror question.

---

art testified that Barrett said that he understood his rights.

FBI Special Agent Renning testified at the pretrial hearing that upon arriving at the Portland FBI office, Barrett was put in contact with him. Renning stated that Barrett was told that he was not under arrest and was free to leave at any time. He then testified that in response to being informed that the robbery occurred on June 5th, Barrett volunteered that he could not have been responsible for the robbery because he was at home preparing for a fishing trip for the major portion of that day. Renning further testified that Barrett said that he shaved his beard and mustache on June 4th, the day before the robbery. Finally, Renning stated that Barrett then called his attorney and made no

further statements. Barrett was allowed to leave the FBI building, but was formally arrested two and one-half hours later.

Barrett's testimony at the pretrial hearing contradicted much of the testimony of Stewart and Renning. Barrett testified that when first confronted at his residence, he was told that he would be arrested if he did not accompany the officers to the Portland FBI office; that he was never verbally advised of his constitutional rights; that while being transported to the FBI office, he responded to the officers' questions by stating that he saw no lawyer in the car, indicating his desire for an attorney; and that he never stated that he spent the major portion of June 5th at home preparing for a fishing trip.