IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 6, 2003

**STATE OF TENNESSEE v. CARLOS GREEN**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-14522     Carolyn Wade Blackett, Judge**

---

**No. W2002-01963-CCA-R3-CD  - Filed November 4, 2003**

---

The defendant was found guilty of first degree premeditated murder and sentenced to life imprisonment.  The defendant now appeals contending that (1) the trial court erred by allowing the defendant's impeachment with inadmissible evidence, and (2) he was denied a fundamentally fair trial because of improper questions and argument by the prosecution.  We hold that (1) the defendant's impeachment was improper, however, the error was harmless, and (2) the State's questions and argument were not  improper, and even if they were improper, they did not rise to the level of plain error.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and JOE G. RILEY, JJ., joined.

Robert Wilson Jones, District Public Defender; and Garland Ergüden, Cathy A. Hailey, and Michael J. Johnson, Assistant Public Defenders, for the appellant, Carlos Green.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; William L. Gibbons, District Attorney General; and Kim Kea Harris and Jerry R. Kitchen, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant, Carlos Green, was found guilty on May 9, 2002, of the first degree premeditated murder of Reedell Seals and  was sentenced to life imprisonment.  His motion for a new trial was denied on July 17, 2002.  The defendant then timely filed his notice of appeal on August 7, 2002.  He contends that (1) the trial court erred by allowing the defendant's impeachment with inadmissible evidence, and (2) he was denied a fundamentally fair trial because of improper questions and argument by the State.

# Facts

Antoine Davis testified that on the night before the shooting, the defendant came home to their house on Pontotoc and told him that he and Reedell Seals (the victim in this case) had "got into it" with some men in the neighborhood. The defendant told Davis that the victim owed one of the men some money. As the men approached them, the victim fled. The defendant shot at the men and stated to Davis that he thought he had hit one of them. Davis testified that the defendant did not seem upset about the incident.

Davis stated that the victim came by the next day looking for his bag. Davis woke the defendant, and he and the victim began talking. Davis testified that he did not know what they were saying. They appeared as if they were talking "with cool and calm heads." The victim and the defendant left to look for the bag on the railroad tracks, while Davis and his girlfriend, Latoya Jones, stayed behind. About ten minutes later, Davis and Jones followed. They soon spotted the victim and the defendant walking up and down the tracks, like they were looking for something. Davis testified that, just before the shooting, the victim and the defendant looked like they were talking. He said that he did not hear any shouting or see anyone throw a punch. Before the defendant shot him, the victim looked like he was bending over to pick something up. The defendant shot him, and he fell to the ground. Davis testified that the defendant was a short distance behind the victim and to his right at the time he shot him. Davis did not see where the gun came from, but stated that he had known the defendant to carry a gun prior to September 17, 2000.

On cross-examination, Davis testified that he and Latoya smoked marijuana the night before the shooting. They were also smoking the next morning as the victim and the defendant left. He stated that he did see some workers as he and Latoya went up the path to the tracks. He said that the victim and the defendant were talking, but he could not hear what they were saying. Davis stated that he was paying attention to his girlfriend at the time of the shooting. Davis testified that he sometimes has vision problems. However, on re-direct, Davis said that he was not having any problems with his vision the morning of the shooting.

Latoya Jones testified that as she and Davis were walking up the railroad tracks, she saw the victim looking in the bushes. The victim turned around and pointed at her and Davis, then he continued looking in the bushes. She then saw the defendant reaching into his pocket. At about the same time, she stumbled and looked down to regain her footing. As she was looking down, she heard a shot. Jones stated that she "wasn't really paying attention." Jones testified that she saw a silver gun in the defendant's hand. She stated that the defendant turned around and was "rapping some kind'a song . . . like nothing never did happen." Jones said that the defendant shot the victim in the head. She also testified that the defendant called her the day after the shooting and asked her not to testify. He said that he would get life if she testified, but he would get off if she did not. Jones said that she hung up the phone and never heard from him again.

On cross, Jones testified that she and Davis had been smoking marijuana the night before the shooting. She denied that she smoked any the morning of the shooting. Jones stated that she never saw a gun that day.

On re-direct, Jones stated that, in fact, she did see the defendant with a gun in his hand after he shot the victim. She said that neither the defendant nor the victim had a bag or anything with them on the tracks.

Jason Barry testified that he was working at Southwest Community College the morning of the shooting. He said that he first saw two men walk by, and then a girl and a guy. Barry stated that he was not really paying attention until he heard a gunshot. He then saw two people leaving the area together. The defendant soon followed. Barry testified that he asked the defendant if there was a body down there. The defendant said no and hurried away. He stated that he did not see anything in anyone's hands. Barry did not actually see the shooting. Matthew McDivitt testified that he was also working near the scene of the shooting that morning. McDivitt said that he saw four people go into the woods and three come out. He did not actually see the shooting; he only heard a shot.

Dr. Cynthia Gardner testified that she performed the autopsy on the victim. She stated that the gun was fired within two feet of the victim. Dr. Gardner testified that the shot came from the right, back to front, and slightly downward. She could not say exactly where the gun was in relation to the body when the victim was shot. She stated that the victim had some injuries around his left eye and cheek. Dr. Gardner testified that the injuries were consistent with a face-down fall. The victim had no injuries consistent with defensive wounds.

Dr. Gardner testified on cross that the victim had a .12 blood alcohol content at the time of death. There was no evidence of drugs in his system. She stated that the injuries around the victim's left eye could have been from a blow. Dr. Gardner again stated that she could not tell what position the body or gun was in when the shooting occurred.

The only witness called by the defense was the defendant himself. The defendant testified that he had known the victim for approximately five or six years. He stated that the night before the shooting, he and the victim were out in the neighborhood trying to get drugs. As they were walking, they came across a group of men. The defendant stated that he recognized at least one of the men as the man had shot the defendant on a previous occasion. One of the men "started going off on Reedell." The man said that the victim owed him money for drugs. The victim told the man that he would pay him later, and he and the defendant walked away. The victim and the defendant next stopped at a liquor store. The defendant stayed outside while the victim went into the store. Before the victim went into the store, he took his money out of a pouch and gave the pouch to the defendant.

As the defendant was standing outside, the men from the earlier confrontation drove up. The defendant testified that he had a gun on him. He took the gun out and placed it in the bag, because he thought there was going to be trouble. When the victim came out of the store, the defendant told him that the men were looking for him. As the defendant and the victim walked towards the back of the store, they noticed the man whom the victim owed money to and another man at the end of the street. Two more men came from the other end of the street and started surrounding the victim and the defendant. The defendant unzipped the bag with the gun because "he knew something was about to go down." The man started yelling at the victim about the money he owed him. The defendant said that he told the victim to just pay him. At that time, the man began pushing the

defendant, and the defendant pushed back. The defendant pulled out his gun and shot in the air above the man's head. He shot two more times, and the man fell to the ground.

The defendant ran, because he thought that he had shot the man. He found out later that he did not actually hit anyone when he shot. He did not see the victim at that time. As the defendant was running away, he put the gun back in the bag and threw it by the railroad tracks. He then returned home and told Davis and Jones that he had shot someone. The defendant told them that he did not know where the victim was. He then went to sleep.

The next morning, Davis woke up the defendant and told him that the victim was at the door and wanted his bag. The defendant said that he told the victim that he threw his bag near the railroad tracks the night before. The victim told the defendant that when the men started surrounding them the night before, he ran behind the auto parts store. The victim told him that the men caught him later and took his money. The defendant stated that the victim was very upset about not having any money to pay his rent. The two men then left to go look for the bag. Davis and Jones were outside of the house smoking a "blunt." The defendant testified that as the two men were walking down the street, the victim was stumbling because he was intoxicated. The defendant stated that the victim was still upset about his money and the missing bag. The two exchanged words at the end of the pathway leading to the tracks. The defendant said that he was not angry with the victim, although he was "ticked off" that the victim ran away the night before. He said that he saw some workers as he first came up the pathway. On the pathway, the defendant told the victim, "[I]f you wasn't my homey," I would "kick your butt right now."

The victim and the defendant then walked up the tracks looking for the bag. The defendant said that he did not know exactly where he had thrown the bag. As he and the victim were looking for the bag, they were still arguing about what had happened the night before. The defendant said he again told the victim, "[I]f you weren't my homey, I'll kick your butt." The victim told the defendant that he did not think the victim could do that. The defendant said in court that the victim was a "small guy," about five feet, four inches tall and 185 to 200 pounds. The defendant is about 265 pounds and younger than the victim. The defendant said that the victim told him, "I think I'll whip your young ass." The two men then returned to looking for the bag.

The victim turned around and pointed down the tracks at Davis and Jones, who were just coming off of the pathway. At about that time, the victim found the bag. The defendant further testified that the victim unzipped the bag and pulled out the gun. The defendant said that, because of his threatening the victim and because the victim had lost his money the night before, he thought the victim was going to shoot him. The defendant stated that the victim pulled the gun out of the bag by the top part. He said that he punched the victim with his right hand and grabbed the back of the gun with his left hand. The defendant testified that he punched the victim again, the victim stumbled, and the defendant then grabbed the front of the gun. The defendant said that the victim came up at him, and he shot him. The defendant stated that he believed the victim would have shot him, because he knew the victim was drunk and upset. The defendant said that he was not trying to kill the victim, only "keep him off of me." He said that he was not "trying to shoot him in his head." The defendant stated that after the victim fell, it occurred to him what had just happened. He grabbed the bag and ran. The defendant said that he put the gun back in the bag and threw it over

a wall. He then ran back home. He said the police showed up soon afterwards, and he told them he was responsible.

On cross-examination, the State began by questioning the defendant about the statement he made to police the day of the shooting. He said that at first, he told the police someone else had shot the victim. Counsel asked the defendant if he told Sergeant Owens that a man named Edward Long shot the victim. The defendant stated that he did not remember telling her that. Counsel then asked the defendant "if [Sergeant Owens] says that you told her that a Edward Long did it," would she be lying. The defendant responded, "yes." Counsel asked the defendant if he told the police that the purpose of bringing the victim to the tracks was to "beat him down." The defendant stated that he did not tell them that. The defendant testified that he never talked to the worker (Barry). He said that it was "Peetie" (Darren Fleming) who spoke to the worker. He testified that "Peetie" does not look anything like him. The defendant said that Jones was lying when she said that he walked away from the shooting rapping a song. The defendant stated that Davis was also lying about the events surrounding the shooting. He testified that he did not have a gun with him when he left the house that morning. Counsel then asked the defendant "if Fleming ["Peetie"] comes in here and testifies that, that gun was on your hip when you walked out that door that morning, he'll by lying too, right[.]" The defendant responded, "yes." When asking the defendant about framing another individual, Counsel stated, "[t]hat was a lie, just like your claim of self defense is a lie, correct[.]" Counsel next asked a series of questions about a letter sent to Antoine Davis. The defendant denied writing the letter. The trial court ruled the letter inadmissible, but did allow counsel to ask questions from it for impeachment purposes.

The State next offered rebuttal witnesses. The first to testify was Darren Fleming ("Peetie"). He stated that he was at the house on Pontotoc the morning of the shooting. He said that he heard the defendant and the victim talking about a bag, and they then left together. Fleming testified that he did not see the defendant with anything when they left. He stated that he saw the defendant with a silver gun earlier that morning, but did not see it when the defendant left. He said that he was not present near the railroad tracks and did not talk to any worker.

Sergeant Venice Owens testified that she took the statement from the defendant on the day of the shooting. She stated the defendant initially told her that he witnessed another man, Edward Lane, shoot the victim. After Owens indicated to the defendant that she had evidence to the contrary, he recanted his story. The defendant told Owens that he took the victim down the tracks "so that he could beat the victim down, because the victim had upset him the night before." The defendant then admitted to shooting the victim.

**Analysis**

The defendant contends on appeal that the trial court erred by allowing him to be impeached with inadmissible evidence. During the State's examination of Antoine Davis, he was asked about a letter that he had received. The letter asked Davis and Latoya Jones not to testify against the defendant. The return address indicated that the letter was from a "Sunge" Green, 404 Jasper Core, Virginia Beach, Virginia. The envelope also had a stamp indicating that it was from the Shelby County Jail. The defendant objected to the admissibility of the letter. The trial court held that the

letter could not be introduced into evidence because the State had not proven that the defendant was the author of the letter. The State again made reference to the letter during its cross-examination of the defendant, and the court again found that the letter could not be admitted into evidence. However, the court did find that the State could question the defendant about the letter for impeachment purposes. The State then proceeded to cross-examine the defendant by making numerous references to the contents of the letter and asking the defendant if he wrote these comments. On each occasion, the defendant denied that he wrote the letter. No special jury instructions were given relating to this evidence.

Although it is a close question as to whether the letter was sufficiently authenticated to be admitted for the jury's consideration, the trial court concluded it was not sufficiently authenticated. For purposes of this appeal, we will not go behind this ruling. Nevertheless, in spite of the trial court's ruling, the state was able to extensively utilize the contents of the letter during cross-examination of the defendant. In light of the trial court's ruling on lack of authentication, we conclude the trial court erred in allowing the extensive references to the contents of the letter. See Tenn. R. Evid. 403. However, a violation of an evidentiary rule does not mandate reversal if the "error was more probably than not harmless." State v. Martin, 964 S.W.2d 564, 568 (Tenn. 1998) (citing United States v. Barrett, 703 F.2d 1076, 1081-82 (9th Cir. 1983)).

Latoya Jones testified that during her phone conversation with the defendant, he asked her not to testify against him. This was the essence of the testimony concerning the letter to Davis. The excerpts from the letter read by counsel are essentially asking the witnesses not to testify against the defendant. The questioning of the defendant about the letter was merely cumulative. In light of the testimony by Jones and the other evidence against the defendant, we cannot say that the improper questioning allowed by the court "affirmatively appear[s] to have affected the result of the trial on the merits." See Tenn. R. Crim. P. 52(a).

The defendant next contends that the State improperly questioned the defendant during cross-examination and made improper remarks during closing arguments. The specific questions and remarks that the defendant takes issue with on appeal were not objected to at trial or raised in his motion for a new trial. Therefore, consideration of the issues has been waived on appeal. See Tenn. R. App. P. 3(e), 36(a).

The defendant urges this Court to consider the issue under the plain error doctrine. "An error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Tenn. R. Crim. P. 52(b). For a court to determine that plain error exists,

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established before plain error will be recognized. Smith, 24 S.W.3d at 282-83. Consideration of all of the factors is unnecessary when the record demonstrates that at least one of the factors cannot be established. Id. at 283. Additionally, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial." Id. (quoting Adkisson, 899 S.W.2d at 642).

In his brief, the defendant addresses three areas of improper argument. In determining whether statements made by the State constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the improper statements affected the verdict. See State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978); Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). An appellate court should consider the following five factors in evaluating whether improper comments affected the verdict to the prejudice of the defendant:
  1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
  2. The curative measures undertaken by the court and the prosecution.
  3. The intent of the prosecutor in making the improper statement.
  4. The cumulative effect of the improper conduct and any other errors in the record.
  5. The relative strength or weakness of the case.
Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

During the State's cross-examination of the defendant, he was asked about whether he had a gun with him when he left the house the morning of the shooting. The following exchange occurred between the State and the defendant:
  Q: So, your testimony is that you didn't have your gun that morning when you left the apartment there and went with Seals on the railroad track; is that your testimony?
  A: Yes, and that's what Antoine and Latoya told them.
  Q: So if Mr. Fleming comes in here and testifies that, that gun was on your hip when you walked out that door that morning, he'll be lying too, right?
  A: Yes, he will.
During the State's rebuttal evidence, Darren Fleming was called as a witness. Although he did not specifically testify that he saw a gun on the defendant's hip when he left that morning, he did testify that he saw the defendant with a gun before the defendant left that morning. The State was not improper in attempting to attack the credibility of the defendant.

The defendant also contends that the State's remarks to the defendant about lying at various times throughout cross were improper. The defendant in this case initially denied shooting the victim. He concocted a story placing the blame on another person. When faced with incriminating evidence to the contrary, he recanted his story and admitted to the shooting. The defendant testified at trial that the other witnesses were lying and that he was telling the truth. The remarks by the State arose in the context of the defendant's accusing other witnesses of lying and inconsistencies in the defendant's story. It cannot be said that the questions by the State affected the verdict to the prejudice of the defendant.

Finally, the defendant contends that remarks made by the State during closing arguments were improper. In his brief, the defendant quotes a large portion of the State's closing argument and asserts that "all of the comments and arguments" were improper. Our review of the State's entire closing argument does not reveal that the State made improper argument.

After reviewing the record and considering the arguments presented by the defendant, we hold that even if the State's questions and argument complained of could be characterized as improper, they were not of "such a great magnitude that [they] probably changed the outcome of the trial."

## Conclusion

We hold that the defendant's impeachment was improper; however, the error was harmless. Additionally, we hold that the State's questions and argument complained of were not improper, and even if they were improper, they did not rise to the level of plain error. Accordingly, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE