**STATE of Utah, Plaintiff and Appellee,**

v.

**Michael James FISK III, Defendant and Appellant.**

No. 971462–CA.

Court of Appeals of Utah.

Oct. 8, 1998.

 

upon questions of law which may be pertinent and helpful in arriving at a final determination of the case'" on remand) (quoting *Lopes v. Lopes,* 30 Utah 2d 393, 518 P.2d 687, 688 (1974)).

Walter F. Bugden Jr. and Tara L. Isaacson, Bugden Collins & Morton, Salt Lake City, for Appellant.

Jan Graham, Atty. Gen., Thomas B. Brunker, and Craig L. Barlow, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before WILKINS, Associate P.J., and JACKSON and ORME, JJ.

## OPINION

JACKSON, Judge:

Michael James Fisk III appeals from the magistrate's interlocutory order denying his motion to dismiss one count of child abuse. The State had previously filed charges against Fisk, but the magistrate dismissed those charges for insufficient evidence.

Fisk asserts that, because the magistrate dismissed the first charges against him, his due process rights would be violated if the State were allowed to refile charges against him. The State argues that it has presented new evidence sufficient to support refiling charges against Fisk under the standard articulated in *State v. Brickey,* 714 P.2d 644 (Utah 1986). The magistrate agreed with the State's contentions and denied Fisk's motion to dismiss.

Because this court lacks jurisdiction over the magistrate's order binding defendant over for trial, we must dismiss this appeal. However, we recognize that a motion in the district court to quash the magistrate's order, followed by an interlocutory appeal to this court, is likely. Thus, in the interest of judicial economy and providing guidance to the parties and the trial court, we also address the *Brickey* issues posed by this case. *Cf. State v. Cloud,* 722 P.2d 750, 755 (Utah 1986) ("'[W]hen a new trial or further proceeding is ordered, it is our duty to pass

## BACKGROUND

Michael and Melissa Fisk were the legal guardians of two-year-old D.S. and his two siblings. On March 19, 1995, the Fisks brought D.S. to Primary Children's Medical Center, in full cardiac arrest. A CT scan revealed bleeding over the surface of his brain and substantial retinal bleeding. Although D.S. was resuscitated, the injuries to his brain have left him in a permanent vegetative state.

D.S. had additional injuries of varying ages, including earlier retinal hemorrhages and bruises on his forehead, ear lobe, arms, legs, and back. A CT scan of D.S.'s abdomen revealed calcified tissue in front of the vertebrae, indicating a prior severe extension or compression of his spine.

In April 1995,[1] defendant and Ms. Fisk were each charged with a single count of child abuse. A preliminary hearing was held on July 18, 1995, before Judge Stephen Henriod, sitting as magistrate.

The State relied on evidence of D.S.'s old and new injuries to support its child abuse charges against defendant and Ms. Fisk. Dr. Helen Britton, a pediatrician and the interim director of the child protection team at Primary Children's Medical Center, testified about the approximate age of D.S.'s injuries, and that they could not have resulted from accidental trauma. However, Dr. Britton was not able to identify precisely the time at which D.S.'s injuries must have occurred. She could testify only that the newer injuries occurred within one week before March 19th, and that the older ones occurred more than one week before that date. Most importantly, she testified only that the massive brain injury that doctors observed on March 19, 1995, could not have been more than one week old.

---

1. It is not clear from the record the exact date when the State filed the information.

Officer Beglarian testified that defendant said he and Ms. Fisk were with D.S. all day on March 19th. On that afternoon, defendant and Ms. Fisk fed D.S. oatmeal. When D.S. began choking on vomit, defendant took D.S. out of his highchair and laid him on his side. D.S. then lost consciousness and stopped breathing. After trying to resuscitate D.S., defendant and Ms. Fisk took D.S. to the hospital.

Further, defendant reported to Officer Beglarian that only he and Ms. Fisk cared for the children. The officer testified that she "assumed" from defendant's statements that he and Ms. Fisk were the children's primary caregivers. However, she could not testify about the number of hours during the day defendant was home with the children, and she acknowledged that she asked no questions on the subject of defendant's control over D.S. on March 19th.

The magistrate determined that the State had shown probable cause to believe that D.S.'s injuries were intentionally inflicted, but had not shown probable cause to connect either defendant or Ms. Fisk to those injuries. Consequently, the magistrate dismissed the information at the end of the July 18, 1995 preliminary hearing.

In November 1995, the State brought a juvenile court action in the interests of the Fisks' foster children. At those proceedings, Ms. Fisk gave her first sworn testimony about the events of March 19, 1995. For the first time, she included a detailed chronology of the critical period before she and defendant took D.S. to the hospital.

Ms. Fisk testified that she began feeding D.S. in the bedroom at about 3:15 p.m., and that defendant was also in the room. She finished feeding D.S. by 3:30 p.m. After she finished, she began brushing D.S.'s teeth, and D.S. then began to scream until he passed out. Ms. Fisk then took D.S. out of the highchair, put him on the floor, and left him in the bedroom alone with the defendant. About thirty minutes later, at 4:00 p.m., defendant brought D.S. out of the bedroom. D.S. was not breathing and had no heartbeat,

and defendant and Ms. Fisk took him to the emergency room.

After the 1995 preliminary hearing, the Salt Lake District Attorney's office turned the case over to the Utah Attorney General's Child Abuse Unit. The Attorney General's office obtained an expert opinion from Dr. Marion Walker, a professor and head of the Division of Pediatric Neurosurgery at Primary Children's Medical Center.

Dr. Walker was able to more precisely establish the time frame during which D.S.'s injuries must have occurred. Dr. Walker noted that a CT scan done on March 3, 1995, showed no evidence of brain damage.[2] However, at the time D.S. was admitted to the hospital on March 19th, D.S. had retinal hemorrhages and fresh bleeding over the surface of his brain.

Dr. Walker opined that D.S. could not have sustained this massive brain injury when Ms. Fisk asserted that D.S. was awake, alert, eating, and fussing—that is, before 3:30 p.m. on March 19th. The injury must have occurred sometime between 3:30 p.m. and 4:00 p.m., when D.S. stopped breathing and defendant carried him out of the bedroom. Dr. Walker concluded that only a shaking and bashing could have caused these injuries. Moreover, he concluded that even a prior head trauma could not explain the magnitude of the injury to D.S.'s brain.

On the strength of Ms. Fisk's juvenile court testimony and Dr. Walker's expert opinion, the State refiled charges against defendant on January 29, 1997. Defendant moved to dismiss the State's charges, arguing that the State was precluded from refiling charges by the Utah Supreme Court's decision in *State v. Brickey*, 714 P.2d 644 (Utah 1986).

The same magistrate heard defendant's motion to dismiss. The State argued that Ms. Fisk's juvenile court testimony and the opinion testimony of Dr. Walker were "new evidence" sufficient to allow refiling charges against defendant. The State contended that

**2.** The March 3rd CT scan was taken when Ms. Fisk brought D.S. to the hospital because she alleged he was "head-banging," that is, intentionally hitting his head against various hard surfaces.

this new evidence showed that defendant had exclusive control over D.S. when his injuries must have occurred, that is, between about 3:30 and 4:00 p.m., when defendant was alone in the bedroom with D.S.

The magistrate denied defendant's motion to dismiss. He commented that if the State had presented the additional evidence at the 1995 preliminary hearing, he would have bound the case over. He also noted that the State could have discovered the additional evidence before the 1995 preliminary hearing. However, he concluded that the State acted in good faith in presenting its case, and that Dr. Walker's expert opinion "may" be "new evidence" under *Brickey*.[3] *Id.* at 645–48. Thus, the magistrate ruled that the State could proceed against defendant on the child abuse charge.

## ANALYSIS

### I. Jurisdiction

■ This court's jurisdiction is created by statute. *See* Utah Const. art. VIII, § 5. Under Utah law, we have jurisdiction over "interlocutory appeals from any court of record in criminal cases." Utah Code Ann. § 78–2a–3(2)(d) (1996). While the magistrate's order binding defendant over for trial was an interlocutory one, *see State v. Jaeger*, 886 P.2d 53, 55 (Utah 1994), the magistrate is not a court of record, *see State v. Humphrey*, 823 P.2d 464, 467–68 (Utah 1991). As a result, this court lacks jurisdiction to hear Fisk's appeal.

Fisk's proper course would have been to file a motion to quash with the district court. Had the district court "refused to quash [the] bindover order, the district court's ruling could then become the subject of an interlocutory appeal" to this court. *Humphrey*, 823 P.2d at 468 n. 9. Although this court erred when we failed to detect the jurisdictional defect earlier, the fact remains that we have no jurisdiction over Fisk's appeal from the magistrate's order. *See Petersen v. Utah Bd. of Pardons*, 907 P.2d 1148, 1151 (Utah 1995) ("[S]ubject matter jurisdiction is an

issue that can and should be addressed sua sponte when jurisdiction is questionable.").

Accordingly, we dismiss Fisk's appeal for lack of jurisdiction.

### II. Refiling Charges Under *Brickey*

Defendant argues on appeal that the State's good faith in presenting its case at the 1995 preliminary hearing does not constitute "other good cause" under *State v. Brickey*, 714 P.2d 644, 647 (Utah 1986). Defendant argues in the alternative that the magistrate lacked sufficient evidence to determine that the State acted in good faith.

If Fisk's appeal were properly before this court, we would conclude that the State presented sufficient new evidence to support refiling the charges against defendant. In reaching this conclusion, we do not address defendant's arguments that the "other good cause" prong of the *Brickey* test was not satisfied, or defendant's arguments about the sufficiency of the evidence. *Id.* at 647. Rather, the issues we address are (1) considerations of due process and public policy, and (2) the "new evidence" prong of the *Brickey* test. *Id.*

"To fairly evaluate [defendant's] claim, the nature and purpose of a preliminary hearing must first be considered." *Id.* at 646. The preliminary hearing requires that the prosecution show, by a sufficient quantum of the evidence, that a crime has been committed, thereby justifying further proceedings. *See id.* The hearing thereby acts as a "screening device" to "ferret out" groundless prosecutions, and at the same time conserves judicial resources. *Id.* The hearing also serves to "promote [ ] confidence in the judicial system." *Id.*

Although the preliminary hearing "is not a full-blown determination of an accused's guilt or innocence; it is nonetheless a 'critical stage' in the criminal process, and proper consideration for a defendant's constitutional rights must be observed." *Id.; see also State v. Anderson*, 612 P.2d 778, 782 n. 9

---

3. The magistrate did not address the issue of whether Ms. Fisk's juvenile court testimony was

"new evidence."

(Utah 1980) (discussing importance of preliminary hearing).

■ "[D]ue process considerations prohibit a prosecutor from refiling criminal charges earlier dismissed for insufficient evidence unless the prosecutor can show that new or previously unavailable evidence has surfaced or that other good cause justifies refiling." *Brickey*, 714 P.2d at 647. Whenever possible, the prosecutor must present the refiled charges to the same magistrate who made the earlier determination of insufficient evidence. *See id.* The magistrate should "not consider the matter de novo, but [should] look[ ] at the facts to determine whether the new evidence or changed circumstances are sufficient to require a re-examination and possible reversal of the earlier decision dismissing the charges." *Id.*

■ This rule protects the defendant's due process rights while ensuring that the State may pursue meritorious charges. *See id.* at 647–48. By limiting the circumstances under which the State may refile criminal charges, this rule ensures that the defendant is not harassed by repeated charges on tenuous grounds. *See id.* at 647. Furthermore, the "same magistrate" requirement prevents the prosecutor from forum-shopping in search of a sympathetic magistrate. *See id.*

We are persuaded that none of these due process considerations are implicated by the facts of this case. While we acknowledge that a prosecutor's good faith is sometimes "a fragile protection for the accused," *id.*, there is no evidence in the record suggesting that the State refiled the charges with the intent of harassing defendant. On the contrary, the same magistrate found that had the new evidence been presented at the first preliminary hearing, defendant would have been bound over for trial.

Furthermore, the State made diligent efforts to ensure that it followed the procedures outlined by *Brickey*. The second preliminary hearing was originally assigned to be heard by a different judge. The State's attorney specifically asked that the hearing be transferred back to the same judge who had presided over the first preliminary hearing. These facts stand in sharp contrast to those of *Brickey*, in which the prosecutor "candidly admitted that he was forum-shopping simply because he disagreed with the decision of the judge who presided at the first preliminary hearing." *Id.* We are persuaded that presenting the charges to the same magistrate alleviates any concerns about prosecutorial harassment or forum-shopping.

We now examine the State's proffered evidence.

### A. *Juvenile Court Testimony*

■ We conclude that Ms. Fisk's testimony at the juvenile court proceeding is "new evidence" within the meaning of *Brickey*. Although the defendant and Ms. Fisk gave statements to three police officers and a social worker before the first preliminary hearing, their accounts were conflicting and none explicitly showed that defendant was alone in the room with D.S. at the relevant time.

The statements given to the police officers did not show defendant's exclusive control over D.S. The statements could easily lead to the conclusion that Ms. Fisk was still in the bedroom with defendant and D.S. at the relevant time. At the very least, they create confusion as to who was with D.S. Defendant stated to Officer Beglarian,

> We were in the bedroom and feeding him in [the] bedroom. He was being hand fed by Melissa—oatmeal with a spoon. He started throwing up and screaming. He sometimes forces himself to lose consciousness. He was in a high chair in [the] bedroom. I took him out of [the] chair—layed him on his side so he would aspirate—observing his breathing. He appeared to of [sic] stopped breathing.

Similarly, in statements to Detectives Barnes and McKee, Ms. Fisk's father (who was at the apartment when D.S. stopped breathing) stated that Ms. Fisk "said she had to go in and feed [D.S.] so she went in to feed him ... and then all of a sudden Michael comes out of the bedroom with [D.S.] in his arms and he says ... Melissa, grab your keys and let's go."

Ms. Fisk told Detective Barns that

when I was done feeding [D.S.] and when I went to brush his teeth, he threw a fit after he was done eating and screamed and passed out and then he'd come to and he was standing up and he fell over once and then he made himself pass out again, it was probably a half hour to an hour after he had eaten when he made himself pass out and I said, you know, [to Michael] keep an eye on him because we always watch him very closely when he passes out. . . .

In none of these statements is it obvious that Ms. Fisk had left defendant alone in the bedroom with D.S. during the thirty-minute period when his injuries must have occurred. Nor did any of the interviews clearly show that defendant was alone with D.S. for about thirty minutes. Ms. Fisk told Detectives Barns and McKee that "after [D.S.] passed himself out for the last time, I went out with my dad . . . and then *all of a sudden* Mike came running out with [D.S.]." (Emphasis added.)

However, at the November 1995 juvenile court proceeding, Ms. Fisk gave a clear account of the afternoon of March 19, 1995, showing that defendant was alone in the bedroom with D.S. during the thirty minutes when his injuries must have occurred. Ms. Fisk testified that, at "about 3:00," she fed D.S. some oatmeal in the kitchen. Defendant was in their bedroom. At about 3:15, "I took [D.S.] in my room with my husband . . . after we finished feeding him, I finished feeding him, I went and got his toothbrush out of the bathroom. . . . I proceeded to come back and start brushing his teeth, and he responded by passing out."

Q: And that's about 3:30?

A: Approximately.

Q: At that point, did you stay in the room with him?

A: I removed him from the highchair and I laid him on the floor and, no, I did not stay in the room. Mike was in the room with him. And I went out with my father and the children.

. . . .

Q: At what point did [D.S.] come out of that room? About what time was it?

. . . .

A: When Mike brought him out.

Q: And about what time was that?

A: I didn't—I was not looking at the clock, but I'm assuming around 4:00.

Ms. Fisk's juvenile court testimony therefore gave the State new evidence: sworn testimony that defendant was alone in the bedroom with D.S. from about 3:30 to 4:00 p.m.

### B. *Expert Opinion*

We agree with the magistrate that the facts presented in Dr. Walker's opinion testimony could have been discovered before the 1995 preliminary hearing in the exercise of ordinary diligence, and in that sense Dr. Walker's testimony is not "new evidence." We note, however, that the *significance* of these facts is apparent only when viewed in light of Ms. Fisk's juvenile court testimony establishing the time frame during which defendant was alone with D.S.

Dr. Walker's conclusion that D.S.'s injuries occurred between 3:30 and 4:00 p.m. depended on his knowledge that D.S. was eating at 3:30 and unconscious by 4:00 p.m., facts which were shown only by Ms. Fisk's juvenile court testimony. Dr. Walker's opinion letter makes clear the dependence of his conclusions on the information presented in Ms. Fisk's testimony:

At approximately 4:00pm on March 19, 1995 [defendant] came from a closed room with [D.S.] in his arms and [D.S.] was cyanotic and not breathing. He was brought to PCMC Emergency Room in this condition. . . . [A]fter the injury occurred this child would not have been able to be awake or conscious. The fact that he was noted to be awake and responsive earlier simply means the injury had not yet occurred. Based on the information available to me, [D.S.'s] massive brain injury occurred after he was seen eating and fussing and within hours to minutes of his cyanotic and apnec [sic] condition at approximately 4:00pm.

Further, the fact that D.S.'s injuries were "minutes to hours" old when D.S. was brought to the hospital is significant, as it relates to defendant, only when considered with the evidence that he was alone with D.S.

for thirty minutes before D.S. stopped breathing. Although Dr. Walker could have examined D.S.'s medical records and CT scans before the 1995 preliminary hearing, his ability to precisely establish the time when D.S.'s injuries must have occurred depended on the information in Ms. Fisk's juvenile court testimony. Thus, we conclude that Dr. Walker's testimony is "new evidence" within the meaning of *Brickey*. *See State v. Brickey*, 714 P.2d 644, 647 (Utah 1986).

### CONCLUSION

Had Fisk's appeal been properly before this court, we would conclude that both Ms. Fisk's juvenile court testimony and Dr. Walker's opinion testimony are "new evidence" sufficient to allow the State to refile charges against defendant. This new evidence was presented to the same magistrate who presided over the first preliminary hearing. We would affirm the magistrate's order denying defendant's motion to dismiss.

However, because Fisk appealed from a magistrate's order, this court does not have jurisdiction to hear his appeal and we must dismiss.

Dismissed for lack of jurisdiction. Norman H. Jackson, Judge

WILKINS, Associate P.J., and ORME, J., concur.