# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of: ) | No. 72306-5-I |
| ) | |
| CALVIN MALONE, ) | DIVISION ONE |
| ) | |
| Appellant. ) | UNPUBLISHED OPINION |
| ) | |
| ) | FILED: May 30, 2017 |
| ) | |

APPELWICK, J. — Malone appeals his order of commitment after a jury found that he is a sexually violent predator. He challenges the admission of an expert's diagnosis of other specified paraphilic disorder, nonconsent. Malone argues that the trial court erred in denying a jury instruction on the possibility of a new civil commitment petition if he is released. He contends that the prosecutor committed misconduct during closing argument and that the trial court failed to investigate potential juror misconduct. Malone asks that costs not be imposed if the State prevails. We affirm.

## FACTS

On September 20, 2012, the State petitioned to involuntarily commit Calvin Malone as a sexually violent predator (SVP) under chapter 71.09 RCW. The State alleged that in 1993, Malone was convicted of three sexually violent offenses: rape of a child in the first degree and two counts of child molestation in the first degree.

And, the State alleged that Malone suffered from pedophilia, which qualifies as a mental abnormality for purposes of RCW 71.09.020(8).

Malone's first civil commitment trial ended in a mistrial. The jury was unable to reach a unanimous verdict. The case proceeded to trial again in July 2014.

The State presented evidence of Malone's lengthy history of molesting young boys. The jury watched Malone's own videotaped deposition, in which he admitted to molesting boys for nearly his entire adult life, when not incarcerated. In 1970, when Malone was 19, he got a job in California with the Boy Scouts of America. There, Malone first molested a young boy, who was 13 or 14.

Malone joined the army in 1971 and was stationed in Germany. Malone began a Boy Scout troop there, and molested six or seven of the boys in the troop. He molested one particular boy for around two years, from the time that the boy was about 12 to 14 years old.

In 1974, Malone moved to Portland, Oregon and started a Boy Scout troop at an elementary school. He molested about six or seven boys there. In 1976, Malone moved to Monterey, California and became associated with a nearby Boy Scout troop. That year, Malone fondled a 12 year old boy in Yosemite National Park, and the boy reported him to the rangers. But, the rangers let Malone go when he denied the allegations. Malone moved to Alabama in 1977, where he established another Boy Scout troop and continued molesting young boys.

Malone moved to Montana about two years later and started another Boy Scout troop. He admitted to molesting about three boys in Montana. D.L. and T.E. both testified that Malone was their Boy Scout troop leader in Montana in 1979.

2

D.L. was around 12 years old while T.E. was around 10 or 11. D.L. recounted several instances when Malone touched him and made him perform oral sex on Malone. T.E. testified that he once spent the night at Malone's house and woke up to Malone touching his genitals. And, T.E. described his Boy Scout troop's overnight skiing trip. Malone molested five of the boys on the trip, including T.E.

From 1981 to 1982, Malone worked at a program for delinquent youth. He molested two boys who were around 13 years old there. Then, he became a counselor at the Gina House, a home for troubled boys in Portland. He molested at least seven boys there, who ranged in age from 13 to 15. The mother of one of these boys offered to pay Malone to take her son to Europe to travel. So, from November 1984 to September 1985, Malone traveled Europe with 13 year old B.M., where he molested the boy. B.M.'s deposition was also read into the record. B.M. believed that the sexual abuse was a condition of his continued freedom in Europe. When he resisted the sexual abuse, Malone made physical threats.

Malone was first arrested on a charge of molestation in 1986. He pleaded guilty to battery for fondling an 11 year old boy in California years earlier. Around the same time, Malone pleaded guilty to lewd and lascivious acts for molesting a 13 year old boy. Upon his release in 1987, Malone was extradited to Oregon to face charges related to the boys at the Gina House. He pleaded guilty to one count of sodomy in the third degree and one count of sexual abuse in the second degree. He was released in 1989. Malone was sent back to prison in 1990 for violating his probation.

In 1991, Malone was released and came to Washington. Here, Malone began working as a caregiver for the terminally ill. A neighbor of his client had an 11 or 12 year old son. Malone molested that boy until September 1992, when he was arrested. He pleaded guilty to one count of rape of a child in the first degree and two counts of child molestation in the first degree. Malone has not been in the community since that arrest. The State filed this petition to commit Malone while he was still incarcerated.

Dr. Amy Phenix testified on behalf of the State. Dr. Phenix diagnosed Malone with three psychological disorders, two of which are paraphilias, or sexual abnormalities. She diagnosed Malone with pedophilic disorder, sexually attracted to males, nonexclusive type. Dr. Phenix relied on the Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5) to form her opinion. She testified that for pedophilia, the DSM-5 suggests that there be a period of at least six months of recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child. It generally defines a prepubescent child as a child that is 13 years old or younger. Dr. Phenix noted that Malone's victims often depended on the age of boys available, but he displayed a clear sexual preference for boys from about age 11 to age 16.

Dr. Phenix also diagnosed Malone with a more general category called other specified paraphilic disorder, which also comes from the DSM-5. She explained that the other specified paraphilic disorder category is used when an individual has an abnormal sexual arousal pattern over at least a six month period and there is no other paraphilia diagnosis that describes the disorder. Dr. Phenix

4

described this diagnosis as a disorder where Malone engages in and is aroused by sexual activity with boys who are going through puberty and just postpuberty. She added a descriptor of nonconsent, to indicate that this arousal pattern applied to nonconsenting victims. This was both because Malone's victims could not legally consent and because they did not choose to willingly engage in sexual activity with Malone.

Lastly, Dr. Phenix diagnosed Malone with opioid use disorder, because Malone has used many substances, and heroin has caused him distress and impairment. Dr. Phenix believed that the driving force behind Malone's sex offending was his paraphilic disorders, but his use of substances disinhibited him and made it easier to act on his urges.

The jury returned a verdict that the State had proved beyond a reasonable doubt that Malone is an SVP. Accordingly, the trial court ordered Malone to be civilly committed. Malone appeals.

## DISCUSSION

Malone argues that the trial court erroneously admitted Dr. Phenix's diagnosis of other specified paraphilic disorder, nonconsent. He asserts that this disorder was actually a "hebephilia" diagnosis and should have been excluded under Frye[1] or ER 702. Malone further contends that the trial court erred in rejecting his requested jury instruction on the possibility of a new petition for civil commitment if he is released. He alleges that the State committed prosecutorial misconduct during closing argument. He argues that the court should remand for

---

[1] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

5

an evidentiary hearing on potential juror misconduct. And, he contends that cumulative error deprived him of a fair trial.

Under chapter 71.09 RCW, the State may civilly commit an individual who is determined to be a sexually violent predator (SVP). In re Det. of Post, 170 Wn.2d 302, 309, 241 P.3d 1234 (2010). At an SVP determination trial, the question for the finder of fact is whether the State has proved beyond a reasonable doubt that the respondent is an SVP. Id.; RCW 71.09.060(1). To answer this question, the jury must find three elements: (1) the respondent has been convicted or charged with a crime of sexual violence, (2) the respondent suffers from a mental abnormality or personality disorder, and (3) that the abnormality or disorder makes the person likely to engage in predatory acts of sexual violence if not confined. Post, 170 Wn.2d at 309-10; RCW 71.09.020(18).

I.  Other Specified Paraphilic Disorder, Nonconsent Diagnosis

Malone contends that Dr. Phenix's diagnosis of "other specified paraphilic disorder, nonconsent" was actually a diagnosis of hebephilia. Malone argues that the trial court erred in admitting this diagnosis. First, he argues that the trial court erred in deciding that a Frye hearing was not needed to resolve this issue. He asserts that to the extent his trial counsel failed to request a Frye hearing, he received ineffective assistance of counsel. Second, Malone argues that the trial court abused its discretion in admitting this diagnosis under ER 702.

Pretrial, Malone moved to exclude evidence that Dr. Phenix diagnosed him with other specified paraphilic disorder, nonconsent. He argued that this diagnosis was inadmissible under ER 702 and 703. He asserted that the diagnosis was

unreliable, because it is not widely recognized or accepted in the scientific community and was rejected by the DSM-5.

The trial court denied this motion. It noted that case law indicates that this type of diagnosis is permitted. As a result, Dr. Phenix testified that she diagnosed Malone with a disorder characterized by engaging in and being aroused by sexual activity with boys who are pubescent and postpubescent. Malone cross-examined Dr. Phenix extensively about this diagnosis. Counsel noted that the diagnosis described by Dr. Phenix is generally called hebephilia or pedohebephilia, which has been rejected for inclusion in the DSM-5. Dr. Phenix confirmed that her diagnosis was really a hebephilia or pedohebephilia diagnosis.

Under Frye, evidence based on novel scientific procedures is admissible only if the theory or principle has achieved general acceptance in the relevant scientific community. In re Det. of Thorell, 149 Wn.2d 724, 754, 72 P.3d 708 (2003). The core concern is whether the evidence is based upon established scientific methodology. Id.

ER 702 provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." For scientific testimony, the expert (1) must qualify as an expert, (2) the expert's opinion must be based on a theory generally accepted in the relevant scientific community, and (3) the testimony must be helpful to the trier of fact. State v. Cheatam, 150 Wn.2d 626, 645, 81 P.3d 830 (2003).

We review the admissibility of evidence under Frye de novo and under ER 702 for abuse of discretion. State v. Greene, 139 Wn.2d 64, 70, 984 P.2d 1024 (1999). An evidentiary error is prejudicial if, within reasonable probabilities, the outcome of the trial would have been materially affected if the error had not occurred. State v. Neal, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001).

Here, Malone's challenge to this diagnosis was under ER 702 and 703. He did not object on the basis of Frye. He did not request a Frye hearing. The trial court ruled on this issue under ER 702 and 703. Making an ER 702 challenge does not preserve a Frye challenge for appeal. We conclude that Malone did not preserve for appeal the issue of whether Dr. Phenix's diagnosis satisfies Frye. See In re Det. of Taylor, 132 Wn. App. 827, 836, 134 P.3d 254 (2006) ("When a party fails to raise a Frye argument below, a reviewing court need not consider it on appeal."). We decline to address the merits of this issue.

Malone asserts that his counsel's failure to request a Frye hearing constituted ineffective assistance of counsel. To succeed on an ineffective assistance claim, the defendant must show that counsel's conduct was deficient and that the deficient performance resulted in prejudice. State v. Nichols, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007). Courts strongly presume counsel's representation was effective. State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). To show deficient representation, the defendant must show that the performance fell below an objective standard of reasonableness, based on all the circumstances. Nichols, 161 Wn.2d at 8. To show prejudice, the defendant must

show that there is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different. Id.

Malone cannot show that he was prejudiced by the failure to request a Frye hearing. Dr. Phenix's pedophilia diagnosis provided an independent basis to sustain the SVP finding. Malone has not challenged that diagnosis. Dr. Phenix testified that she diagnosed Malone with three psychological disorders: pedophilic disorder, sexually attracted to males, nonexclusive type; other specified paraphilic disorder, nonconsent; and opioid use disorder. She found that Malone "easily" fit the criteria for pedophilia. While many of Malone's victims were over the age of 13, he also had victims who were 13 and under, falling under the definition of prepubescent. Two of those victims testified at trial, and the deposition of a third was read into evidence. Malone admitted to molesting boys who were 13 and under in his videotaped deposition, which the jury watched at trial.

This case is analogous to In re Personal Restraint of Meirhofer, 182 Wn.2d 632, 343 P.3d 731 (2015). Meirhofer was found to be an SVP in 2000. Id. at 637. At his civil commitment trial, the State presented evidence that he suffered from pedophilia, paraphilia not otherwise specified (NOS) nonconsent, a personality disorder with antisocial features, and alcohol and amphetamine dependence. Id. In the 2010 report on Meirhofer's condition, the State's expert stated that there was insufficient evidence to diagnose Meirhofer with pedophilia. Id. at 639. The expert diagnosed Meirhofer with paraphilia NOS hebephilia, paraphilia NOS nonconsent, and personality disorder NOS with antisocial and borderline traits. Id. at 640. The

trial court found that the State had met its prima facie burden of showing that Meirhofer continued to meet the definition of an SVP. Id. at 642.

On appeal, Meirhofer argued that because the State's expert did not diagnose him with pedophilia, the State could not show that he continued to meet the definition of an SVP. Id. at 643. Meirhofer contended that hebephilia could not serve as a qualifying mental abnormality or personality disorder. Id. at 644. But, the Supreme Court declined to reach this issue. Id. at 645. It noted, "But regardless of whether hebephilia is an accepted diagnosis in the relevant scientific community (a question we need not decide), the State presented sufficient prima facie evidence that Meirhofer has consistently suffered from paraphilia NOS nonconsent and a personality disorder." Id. These diagnoses showed that Meirhofer suffers from a mental abnormality or personality disorder, so the State met its prima facie burden. Id.

While the procedural posture of this case differs from Meirhofer, we consider it instructive. Here, the State presented abundant evidence that Malone suffered from pedophilia, which is a basis to make an SVP finding. Malone was not prejudiced by counsel's failure to request a Frye hearing, because even without Dr. Phenix's other specified paraphilic disorder, nonconsent diagnosis, the jury could have found that Malone was an SVP.

Yet, Malone argues that the jury would not have done so. He contends that the primary difference between his first SVP trial, where the jury could not reach a verdict, and the second, where it did, was the other specified paraphilic disorder, nonconsent diagnosis. Malone relies on Post to support this argument. Post's first

SVP trial ended in a mistrial, because the jury was unable to reach a verdict. 170 Wn.2d at 306. At the second trial, the State introduced evidence about the treatment that would be available to Post if he were committed. Id. at 306-07. The Supreme Court held that the trial court abused its discretion by permitting the State to present this evidence. Id. at 314. It further held the admission of this evidence was not harmless error, because there was a reasonable probability that it affected the outcome. Id. at 314-15. The court found that the fact that the jury deadlocked in the first trial, but found that Post was an SVP at the second trial, where this evidence was presented, was persuasive evidence that the evidence affected the outcome. Id. It also noted that this evidence was not merely presented in passing, but was thorough, systematic, and repeated. Id. at 315. And, the court pointed to the fact that the jury submitted multiple questions to witnesses about treatment options that would be available to Post if he were committed. Id.

Here, Dr. Phenix's diagnosis of other specified paraphilic disorder, nonconsent was not the only difference between the trials. The jury in the first trial, when asked why it could not reach a verdict, focused on Malone's release plan. In response, during the second trial, the State spent greater effort to show that Malone's proposed release plan was inadequate. Also, the experts were different. Their credentials and experience was different, and their diagnoses were different. Dr. Matthew Logan testified at the first trial. He diagnosed Malone with nonexclusive pedophilia, polysubstance dependence, and adult antisocial behavior. Dr. Phenix's diagnosis was pedophilic disorder, sexually attracted to males, non-exclusive type, other specified paraphilic disorder, nonconsent; and

opioid use disorder. Which of these differences was significant to the jury's decision is not discernable from the record.

Unlike in Post, we cannot say that the second jury would not have found Malone to be an SVP but for Dr. Phenix's additional diagnosis. Malone has not established that any error in admitting this evidence was prejudicial. Therefore, we hold that counsel's failure to request a Frye hearing did not constitute ineffective assistance.

Any error in admitting this evidence was not prejudicial. Because we conclude that admission of this diagnosis did not prejudice Malone, we need not decide whether the court abused its discretion in admitting it under ER 702.

## II.   Jury Instruction

Malone asserts that the trial court erred in refusing to give his requested jury instruction regarding the State's ability to file a new petition to civilly commit Malone if he commits a recent overt act upon his release. Malone contends that the evidence supported this instruction.

The standard of review on this issue depends on whether the trial court's refusal to give the jury instruction was based on law or fact. State v. Walker, 136 Wn.2d 767, 771, 966 P.2d 863 (1998). This court reviews a denial of a jury instruction for abuse of discretion if based on a factual dispute, but de novo if based on a ruling of law. Id.

The trial court has discretion in determining how many instructions are necessary to present a party's theories. State v. Long, 19 Wn. App. 900, 902, 578 P.2d 871 (1978). Jury instructions are sufficient if: "(1) they permit the party to

argue his or her theory of the case; (2) they are not misleading, and (3) when read as a whole they properly inform the trier of the fact on the applicable law." Id.

Malone proposed a jury instruction that provided in part:

> Placement conditions that do exist in the community is the fact the state may file a new Petition charging Calvin Malone as a sexually violent predator if it learns he has committed a 'recent overt act.'

> A 'recent overt act' means any act, threat, or combination thereof that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act or behaviors.

The trial court denied this proposed language. Malone asserts that this was an error of law, because the instruction was consistent with Washington case law. He points to Post as support for this argument. In Post, the trial court prohibited Post from introducing evidence that he could be subject to a new SVP commitment petition if he committed a recent overt act after being released into the community. 170 Wn.2d at 307.

On appeal, the Supreme Court ruled that such evidence is relevant and does not violate RCW 71.09.060(1). Id. at 317. It noted that if released, Post would be subject to RCW 71.09.030(1)(e), which permits the State to bring a petition to civilly commit a person who has previously been convicted of a sexually violent offense and has committed a recent overt act since being released. Id. at 316. The court acknowledged, "Post's knowledge of the consequences for engaging in such conduct may well serve as a deterrent to such conduct and, therefore, has some tendency to diminish the likelihood of his committing another

predatory act of sexual violence." Id. at 316-17. Because Post's likelihood of committing another predatory act of sexual violence was an element before the jury, this evidence was relevant to determining whether Post was an SVP. Id. at 317. But, the court declined to answer whether the evidence was admissible, noting that ER 403 issues of unfair prejudice and confusion are best addressed by the trial court. Id.

The trial court does not abuse its discretion in refusing to give a jury instruction that is unsupported by substantial evidence.[2] See State v. Picard, 90 Wn. App. 890, 902, 954 P.2d 336 (1998). Here, evidence that the possibility of a new petition for civil commitment would serve as a condition on Malone's release could have been relevant. But, Malone did not present any such evidence. During his testimony, Malone did not suggest that he knows about the consequences of committing a recent overt act. He did not suggest that he would be less likely to reoffend because of this possibility. In fact, Malone presented no evidence of the possibility of a new petition for civil commitment.

The only evidence of the possibility of a new petition for civil commitment came up during the State's rebuttal case. The State called Christopher Ervin, a community corrections officer. Ervin testified about the conditions that would be imposed on Malone if he were released. On cross-examination, Malone elicited

---

[2] We review the court's denial of Malone's requested instruction for an abuse of discretion. In denying the instruction, the trial court focused on Post and the evidence that arose during trial. Because the court denied the instruction based on a factual dispute, not an interpretation of law, abuse of discretion is the proper standard.

information about recent overt acts. Ervin stated that he was familiar with the concept. Malone continued,

> And a recent overt act means that someone who is a sex offender, if someone commits an act or threat or combination thereof that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in that act or behavior, that if that happens someone can be confined, correct?

Ervin responded, "It depends." Malone clarified, asking if a petition for civil commitment could be filed, and Ervin responded that potentially, a petition could be filed. Malone summarized: "So even if someone is released for example, if Mr. Malone were released after this trial and he went, for example, to the Lambert House [an organization for lesbian, gay, bisexual, and transgender youth], he could potentially have a new petition filed on him, correct?" Ervin answered yes.

Without proffered evidence that Malone knew of this provision, understood what it meant, and believed that it would make him less likely to reoffend, the trial court could not consider admitting evidence on this issue. Because whether a new petition for civil commitment would make Malone less likely to reoffend was not factually at issue, an instruction on the law was not necessary. The trial court did not abuse its discretion by refusing to give the instruction.

Moreover, Malone was not prevented from arguing to the jury that the possibility of a new petition for civil commitment would function as a condition upon

15

his release. During closing argument, Malone's counsel emphasized the conditions to which Malone would be subject upon his release. Counsel said,

> So what we know is that he will have these things for two years, but for the rest of his life he will be subject to the recent overt act. And Mr. Ervin explained to you a little bit what that is. He said you don't even have to attempt a crime. If you are in the neighborhood and loitering around the Lambert House, that's a recent overt act. He'd go back.

And, the jury instructions that were given provided that the jury could consider placement conditions or voluntary treatment options that would exist if Malone were unconditionally released from detention. Thus, the argument was not inconsistent with the jury instructions, and counsel was not prevented in making this argument to the jury. We conclude that the trial court did not err in refusing to give the instruction on the possibility of a new civil commitment petition if he were released.

III. Prosecutorial Misconduct

Malone argues that the State purposefully disparaged the defense, thereby depriving him of a fair trial. He contends that the Assistant Attorney General (AAG) called defense counsel's integrity into question during closing argument.

Prosecutorial misconduct warrants reversal where actual misconduct occurs and there is a substantial likelihood that the misconduct affected the verdict. In re Det. of Law, 146 Wn. App. 28, 50, 204 P.3d 230 (2008). The defendant bears the burden of proving both elements. Id. We view alleged prosecutorial misconduct in light of the entire argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. Id. When the defendant did

not object to the argument at trial, we will not reverse a verdict on the basis of prosecutorial misconduct unless the prosecutor's conduct was so flagrant and ill-intentioned that no curative instruction could have removed the prejudice. Id. at 50-51.

The State's rebuttal closing argument focused almost entirely on statements made during Malone's closing argument. The State began,

> So Mr. Malone's presentation of evidence and his closing argument consist of little more than misdirections, idle threats, half truths, and lots of evidence of selective listening as to what happened during the last two and a half weeks. And until I heard the argument I thought it was just limited to Mr. Malone and [Malone's expert] that those two things were true. But let's just talk about a little bit of the selective listening and selective readings that was just described for you for the last hour and 20 minutes.

The AAG proceeded to identify certain aspects of Malone's closing argument that misdirected the jury. First, the AAG pointed to counsel's argument that Dr. Phenix admitted to using unstructured methodology during her testimony. The AAG said, "That is objectively not true" and "that is one piece of selective listening." Then, the AAG pointed to counsel's comments that Dr. Phenix did not interview Malone in person. The State called this "misdirection." Next, the AAG pointed to counsel's chart about the possibility of re-offending, and called that chart "misdirection." The AAG said that the data was "misrepresented" on the slides that counsel used. The AAG also addressed counsel's comment about Malone's jail time, saying, "Something that was also objectively false is the slap on the wrist. So they said that the only time he's ever been to jail was a year in Oregon. That is not what happened." The AAG commented that the "last one that I am bothering to talk

17

about is how these young boys in prison looked," calling that "another piece of misdirection."

Then, in wrapping up closing argument, the AAG addressed Malone's theme of the case. Malone's counsel began closing with a song: "I don't want the world to see me because I don't think that they'd understand. When everything has broken I just want you to know who I am." Defense counsel suggested that this song was an appropriate anthem for Malone's case and his life, because he has done terrible things and is afraid people will not understand who he is today. The AAG ended her rebuttal closing argument by suggesting a more appropriate anthem for this case, a quote:

> It says, one of the saddest lessons of history is this. If we've been bamboozled long enough we tend to reject any evidence of the bamboozle. We're no longer interested in finding out the truth. The bamboozle has captured us. It's simply too painful to acknowledge even to ourselves that we've been had. Once you give a charlatan power over you, you almost never get it back.

Malone did not object to any of the above statements during closing argument.[3] Therefore, we must decide whether the comments were improper and if so, whether they were so flagrant and ill-intentioned that an instruction could not have cured the prejudice. State v. Negrete, 72 Wn. App. 62, 67, 863 P.2d 137 (1993).

---

[3] Malone did make one objection on the basis of prosecutorial misconduct. But, this was to an entirely different portion of the State's rebuttal closing argument, and the objection was on the basis that the State was stating things that were not true. This objection was not sufficient to preserve the issues discussed in Malone's brief for appeal.

Washington courts have previously recognized that the prosecutor severely damages a defendant's opportunity to present his or her case by making statements that impugn the role or integrity of defense counsel. State v. Lindsay, 180 Wn.2d 423, 431-32, 326 P.3d 125 (2014). In Lindsay, the Supreme Court held that the prosecutor committed misconduct by responding to defense counsel's closing argument: " 'This is a crock. What you've been pitched for the last four hours is a crock.' " Id. at 433. The court reasoned that the term "crock" implies deception and dishonesty. Id.

Similarly, in State v. Thorgerson, 172 Wn.2d 438, 450-51, 258 P.3d 43 (2011), the prosecutor's theme during closing argument was that the defense engaged in "sleight of hand." The prosecutor argued, " 'The entire defense is sl[e]ight of hand. Look over here, but don't pay attention to there.' " Id. at 451 (alteration in original). And, the prosecutor used words like "bogus" and "desperation" in describing the defense. Id. at 450. The Supreme Court reasoned that insofar as these comments focused on the evidence before the jury, there was no misconduct. Id. at 451. But, it determined that the prosecutor went too far by disparaging defense counsel's integrity, suggesting that he presented a bogus, sleight of hand case. Id. at 451-52. These phrases implied wrongful deception or even dishonesty. Id. at 452. Even so, the court concluded that the statements were not prejudicial, because they essentially told the jury to disregard what the prosecutor believed to be irrelevant evidence, and could not be construed as having had a significant likelihood of altering the jury's verdict. Id.

Like in <u>Lindsay</u> and <u>Thorgerson</u>, the AAG's comments here suggested that defense counsel herself was dishonest. The AAG's theme of rebuttal was that defense counsel's closing argument was comprised of "selective listening" and "misdirection." After listing multiple examples of defense counsel's misrepresentations, the AAG ended with a quote about being bamboozled. Rather than simply comparing and contrasting Malone's interpretation of the evidence with the State's, the AAG repeatedly suggested that defense counsel was misdirecting the jury and misrepresenting the evidence. This called counsel's integrity into question, and was likely improper.

However, these statements were not prejudicial. The AAG's "misdirection" and "selective listening" comments do not rise to the same level as calling defense counsel's argument a "crock" or "bogus." These comments did not suggest that counsel's entire case was a sham. And, given the wealth of evidence against Malone—Dr. Phenix's multiple diagnoses, Malone's own admitted history of child molestation, and the testimony of several of his victims, we cannot conclude that these comments affected the verdict. Had Malone objected, an instruction could have cured any potential prejudice. We conclude that Malone is not entitled to a new trial on the basis of prosecutorial misconduct.

IV.   Juror Misconduct

Malone contends that the trial court failed to properly investigate allegations of juror misconduct that came to light after his trial. He points to three alleged instances of juror misconduct: a sleeping juror, jurors who announced that they had made up their minds on the third day of trial, and deliberations that proceeded

20

without all jurors present. Malone asks us to remand for an evidentiary hearing to determine the extent and prejudice of this potential misconduct.

A juror, Shirley Mukhar, responded to the jury exit questionnaire with comments that she believed would make the jury process better. These comments included "NO SLEEPING DURING TESTIMONY or maybe the question could be asked in Voir Dire if anyone has a problem staying awake during the day." She stated that a particular juror worked nights and "had trouble staying awake." Mukhar mentioned that the same juror admitted that he had done outside research during the trial. She said that a couple of the jurors commented that their minds were made up by the third day of trial. And, she stated that a juror had to use the bathroom in the middle of a discussion during deliberation, but the discussion continued.

Both Malone and the State submitted proposed questions to ask Mukhar about her questionnaire. Malone's questions focused on several topics: the other juror's outside research, jurors' comments that their minds were made up, and jury deliberations when some jurors were absent. Malone later submitted supplemental proposed questions on the jurors' knowledge of Malone's book. The trial court ruled on which series of questions would be appropriate. It ruled that Malone's questions about whether jurors did outside research were appropriate, but the other lines of questioning were not. At a hearing, both Mukhar and Thomas Reilly, the juror Mukhar identified as having conducted outside research, testified.

A. Sleeping Juror

Malone asserts that his right to a fair trial might have been compromised by a sleeping juror. He argues that Mukhar's allegation that a juror was having trouble staying awake obligated the trial court to investigate this allegation.

Unlike the other instances of potential juror misconduct, Malone never raised concern about a possible sleeping juror in the court below. This issue was not included in Malone's proposed questions for Mukhar or his motion for a new trial. Because Malone raises this issue for the first time on appeal, we need not address it. See RAP 2.51(a).

Moreover, the cases upon which Malone relies do not support his position. He cites State v. Jorden, 103 Wn. App. 221, 11 P.3d 866 (2000) and United States v. Barrett, 703 F.2d 1076 (9th Cir. 1983). In Jorden, the State moved multiple times to disqualify a juror who was sleeping during trial. 103 Wn. App. at 224-25. Ultimately, the court excused the juror. Id. at 226. In doing so, the judge relied on his own observations of the juror as yawning, dozing, and sitting with her eyes closed during witness testimony. Id. On appeal, Jorden argued that the trial court was required to question the juror to determine if misconduct had occurred. Id.

In Barrett, a juror asked to be removed prior to deliberations, because he had been sleeping during the trial. 703 F.2d at 1082. Barrett moved to dismiss the juror, but the trial court denied the motion. Id. The jury found Barrett guilty. Id. Barrett then sought to interview the juror, but the trial court denied the motion, stating that there was no juror asleep during trial. Id. at 1082-83. The Ninth Circuit held that the trial court abused its discretion by failing to conduct a hearing or

investigate the potential sleeping juror issue. Id. at 1083. It remanded for a hearing to determine whether the juror was sleeping, and if so, whether Barrett was prejudiced. Id.

This case differs significantly from both Jorden and Barrett. In those cases, the parties and the court were aware of the potential sleeping juror before a verdict was entered. Jorden, 103 Wn. App. at 224-25; Barrett, 703 F.2d at 1082. Thus, the court had an obligation to inquire into the possibility that a juror was sleeping. We decline to extend Jorden and Barrett to apply to this kind of allegation when it is first raised after a verdict.

### B. Jurors Absent During Deliberations

Malone contends that jury deliberations took place when fewer than 12 jurors were present. He points to Mukhar's comment in the exit questionnaire that a juror had to use the bathroom during deliberations. In response, the State contends that the trial court was not authorized to inquire into any possible 11 juror deliberations. It suggests that such internal processes inhere in the verdict.

Under RCW 71.09.060(1), when a jury determines that a person is a sexually violent predator, the verdict must be unanimous. Even though SVP proceedings are civil, principles regarding the right to unanimous jury verdicts in criminal proceedings apply equally. In re Det. of Pouncy, 144 Wn. App. 609, 617, 184 P.3d 651 (2008), aff'd, 168 Wn.2d 382, 229 P.3d 678 (2010); In re Det. of Halgren, 156 Wn.2d 795, 807-09, 132 P.3d 714 (2006). A unanimous verdict means that the "12 jurors must reach their consensus through deliberations which

are the common experience of all of them." State v. Fisch, 22 Wn. App. 381, 383, 588 P.2d 1389 (1979).

A jury's decision is contained entirely within the verdict. State v. Young, 48 Wn. App. 406, 414, 739 P.2d 1170 (1987). Thus, courts must not impeach a verdict based on the details of the jury's deliberations. Long v. Brusco Tug & Barge, Inc., 185 Wn.2d 127, 131, 368 P.3d 478 (2016). Facts connected to the juror's motive, intent, or belief inhere in the verdict. Id. So, a court cannot consider facts about the mental processes through which individual jurors reached the verdict, the effect of the evidence on the jurors, or the weight that particular jurors may have given to particular evidence. Id. at 131-32.

Malone relies on State v. Lamar, 180 Wn.2d 576, 327 P.3d 46 (2014) to argue that his right to a unanimous verdict was violated where deliberations took place without all 12 jurors present. In Lamar, the jury began deliberating on Friday afternoon. Id. at 580. On Monday, the court replaced a juror who had become ill. Id. The court instructed the jury to spend some time reviewing the discussions from Friday with the alternate. Id. The Supreme Court held that the trial court erred in affirmatively instructing the jury not to revisit and deliberate together anything discussed on Friday. Id. at 587. In reaching this conclusion, the court specifically noted, "Of course we do not know what actually occurred on Friday and so do not know what was addressed. And a court must not intrude into the jury deliberations to determine what the jury has decided or why, or how the jury viewed the evidence." Id.

Here, Malone does not contend that erroneous jury instructions invited the jury to reach a verdict that was not unanimous. Instead, he argues that the trial court should have looked into the internal processes of the jury to examine how many jurors were in the room at what time, when jury deliberations occurred, and whether deliberations continued during bathroom breaks. Lamar does not permit this type of inquiry. In fact, it explicitly prohibits it. Therefore, we conclude that an evidentiary hearing on this issue is not warranted.

C. Jurors Made up Their Minds

Malone further argues that the trial court erroneously refused to investigate Mukhar's comments that a couple of jurors had made up their minds by the third day of trial. Malone contends that these jurors demonstrated that they could not follow the court's instructions. He asserts that this error does not inhere in the verdict.

This court has previously addressed the issue of whether courts may consider the time that jurors made up their minds. State v. Hatley, 41 Wn. App. 789, 793, 706 P.2d 1083 (1985). Hatley moved for a new trial after a juror's alleged misconduct came to light. Id. at 792. The trial court held an evidentiary hearing. Id. At the hearing, the juror admitted that he had talked to an acquaintance about the trial during the second week of the three week trial. Id. He denied stating an opinion about Hatley's guilt to that acquaintance, but admitted that he made up his mind before the jury began to deliberate. Id. The trial court found that the juror made his final decision about Hatley's guilt before the jury deliberated, and that this misconduct prejudiced Hatley's right to a fair trial. Id.

The Court of Appeals reversed the order granting Hatley a new trial. Id. at 795. It determined that the trial court improperly considered the juror's testimony as well of that of the juror's acquaintance, because the facts in this testimony were linked to the juror's motive, intent, or belief. Id. at 794. Such evidence of jurors' mental processes, including their expressed opinions and when they made up their minds, inheres in the verdict. Id. at 793-94. And, the court noted that even if the juror made up his mind before deliberations began, this misconduct was not prejudicial. Id. at 794. It reasoned that if a new trial were required every time a juror revealed his private opinion during trial, it would open the door to widespread interrogation of jurors after trial. Id. at 795.

Malone contends that the facts alleged here did not inhere in the verdict, because if jurors announced their private opinions in front of the rest of the jury, they indicated their inability to follow instructions. But, this argument is at odds with Hatley. Evidence of when any particular juror made up their mind or expressed their opinions to the rest of the jury is linked to that juror's motive, intent, or belief. Id. at 793-94. It inheres in the verdict. Id. We conclude that the trial court did not err in refusing to investigate this alleged juror misconduct.

V.    Cumulative Error

Malone asserts that the alleged errors resulted in cumulative error. The cumulative error doctrine applies where multiple trial errors combine to deny the accused a fair trial, even if the errors individually would not warrant reversal. In re Det. of Coe, 175 Wn.2d 482, 515, 286 P.3d 29 (2012). We conclude that cumulative error did not deprive Malone of a fair trial.

26

VI.  Appellate Costs

Lastly, Malone asserts that appellate costs should not be imposed.  He contends that the reasoning of State v. Sinclair, 192 Wn. App. 380, 367 P.3d 612, review denied, 185 Wn.2d 1034, 377 P.3d 733 (2016), should apply here.  The State responds that since SVP proceedings are civil, not criminal, Sinclair does not apply.

In Sinclair, this court recognized that RCW 10.73.160(1) and RAP 14.2 give the appellate court discretion to deny the State's request for appellate costs when a criminal defendant is unsuccessful on appeal.  192 Wn. App. at 385-86, 388.  The court exercised its discretion to rule that an award of appellate costs was not appropriate where the criminal defendant was found to be indigent for purposes of appeal, and there was no realistic possibility that his financial condition would improve.  Id. at 393.

Sinclair was limited to the context of an indigent criminal defendant.  It relied largely on RCW 10.73.160(1), which provides that the Court of Appeals may require an adult offender convicted of an offense to pay appellate costs.  Id. at 385, 388.

An SVP proceeding is a civil proceeding, not a criminal trial.  See In re Det. of Strand, 167 Wn.2d 180, 191, 217 P.3d 1159 (2009).  Malone appeals his order of commitment, not a conviction.  We decline to extend the logic of Sinclair

to civil proceedings involving indigent individuals.  An award of appellate costs to the State is appropriate.

We affirm.

WE CONCUR: